THOMAS CRAWFORD WILDE
*vs.*
THE INHABITANTS OF THE TOWN OF MADISON

Somerset.   Opinion, March 25, 1950.

*Dubord and Dubord,*
*James G. Davian,* for plaintiff.

*Bernard Gibbs,* for defendant.

SITTING: MURCHIE, C. J., THAXTER, FELLOWS, MERRILL, NULTY, WILLIAMSON, JJ.

FELLOWS, J.   This case is on report.   The record shows that a forest fire occurred in the town of Madison on October 21, 1947 and the plaintiff suffered damage to his woodlands thereby.   The season was very dry.   The fire started near a dump, whereon was a fire or fires kept burning to dispose of rubbish.   Not far from the dump with its fires there was much accumulated slash, underbrush, and other combustible material.   On the day in question there was a high wind blowing in a direction from the dump towards this debris.

The land on which this dump was situated belonged to one Harry E. Fall, and on February 24, 1948, after the forest fire, the town of Madison paid to Fall the sum of $75.00 for permitting its use as a dump for the year 1947. There was no collection of rubbish by the town, but any resident was allowed to bring and to deposit his refuse there without charge.

The facts indicate that the town of Madison, or its citizens, had been accustomed for many years to use this dumping ground, and the town paid to one Max Daigle in 1947 the sum of $160.00 for smoothing and otherwise caring for the dump, with other items for labor in clearing and constructing the road to the dump, amounting to $464.56.

The plaintiff claims that the dumping ground was maintained by the defendant town; that the town was negligent during this dry season in maintaining it; that the fire which damaged the plaintiff originated at the dump and spread to the plaintiff's property; that this dumping ground negligently maintained, although not a nuisance *per se,* became and was a nuisance, and the plaintiff is entitled to recover for his loss.

The defendant denies the plaintiff's contentions and says that the town was not negligent; that if the town did maintain the dump, its conduct was in the exercise of a governmental function from which the town derived no benefit or advantage; that there is no statute authorizing suit; that the acts were *ultra vires;* that if there was any negligence, the municipality, under the circumstances, is not liable.

This case is by agreement of the parties "reported to the Law Court in pursuance of the provisions of Revised Statutes, Chapter 91, Section 14 for submission of the whole controversy and for final decision including the questions of damages." In a case "on report" the plaintiff has the burden of proof. *Kerr* v. *State of Maine,* 127 Me. 142, 143; *Linn* v. *Barker,* 106 Me. 339.

Harry Webber testified that he lived only 200 feet from the dump; that on October 21, 1947 he went home to noon meal; that there were slash and dry underbrush southeast of the dump where one Pinkham had been cutting lumber; that fires were burning on the dump; that he was at the dump and "we looked it over" at a "quarter or ten minutes of twelve;" that there was a strong northwest wind; that he saw no one about the dump at the time; that later while he and his son were eating, his son "noticed the fire" and "he started to call the fire department but somebody called ahead of him;" that he does not know whether any person brought papers or other inflammables to the dump between 10:30 and 12 o'clock.

The forest fire was seen by the State Forest Service from the fire station on Kelley Mountain at 12:30. The report of the Forest Service shows a strong northwest wind.

Max Daigle, paid by the town of Madison as caretaker, testified that he left the dump at 10:30 and as usual went to his home for lunch; that he did not know of any person being at the dump or going to the dump while he was at home; that there was some slash 50 or 60 feet away from the dump; that fires were always burning on the dump; that on October 21 the dump was "smudging, no blazes;" that at times the town furnished another man to help; that the town furnished some items of fire fighting equipment; that while at home on October 21 he saw from his porch the fire and it looked to be "somewhere around 400 feet from the dump;" that when he arrived at the fire men were fighting fire 150 to 200 feet from the dump; that after the fire was under control, he saw that the fire had burned "right up to the dump."

Charles Worster, a member of Madison Fire Company, testified that he went to the dump in the middle of the forenoon and found a "small amount of fire smouldering at the base of the dump;" that Mr. Daigle "got a shovel and put the fire out;" that later in the day he helped to fight the for-

est fire, and that the forest fire, because of the high wind and dry conditions, could have started from the dump but he could not tell whether it actually did or not.

Other witnesses testified as to the dry season; the fires always burning on the dump; the atmospheric conditions of the day of the forest fire, and the apparent path of the fire. No person, however, saw the forest fire when it started, and witnesses disagreed as to the exact point where it started, but stated that it was "near" the dump fire. The dump had been used for nearly forty years as a dumping ground, and during that period no fires had previously "got away from the dump." No one had ever complained that the dump was a danger, or that the conditions were dangerous. The town had no notice at any time that the dump was a "nuisance" or that anyone claimed that it was.

The court finds that the forest fire started from the dump because of the proximity of its starting point to the dump fire; the direction of the wind; the slash and brush nearby; the dry conditions, and the absence of other probable sources. The facts proved compel this inference, although no eye saw the "flying spark." *Duplissey* v. *Railroad Company*, 112 Me. 263; *Jones* v. *Railroad Company*, 106 Me. 442.

Is the defendant town liable under the facts in this case? It has long been the general rule in Maine, as in most other jurisdictions, that towns and other public corporations are not liable for unauthorized and wrongful acts of their officers, though done in the course and within the scope of their employment. In the case of private corporations the rule is that a corporation is liable for unlawful acts and neglects of their officers and agents when done within the scope of their employment. *Small* v. *Danville*, 51 Me. 359.

Where the statute authorizes or requires a municipal corporation to do some governmental act or carry out some duty, the corporation is not liable for the negligent acts of its officers in its performance, unless the liability is created

by statute. Towns are then but subdivisions of the state. If the statute permits, authorizes, or directs, and the municipal corporation for its own profit or advantage negligently performs some act, there may be liability as in the case of private corporations. *Moulton* v. *Scarboro,* 71 Me. 267; *Libby* v. *Portland,* 105 Me. 370; *Palmer* v. *Sumner,* 133 Me. 337. There is no liability on the part of a town, however, if the act is *ultra vires. Seele* v. *Deering,* 79 Me. 343.

The law exempts municipal corporations from neglect, or negligent performance of public or governmental duties that have been imposed, or authorized by statute. *Woodcock* v. *Calais,* 66 Me. 234; *Burrill* v. *Augusta,* 78 Me. 118; *Tuell* v. *Marion,* 110 Me. 460; *Bowden* v. *Rockland,* 96 Me. 129; *Keeley* v. *Portland,* 100 Me. 260, 265; *Palmer* v. *Sumner,* 133 Me. 337.

When a public benefit, as a hospital authorized by statute, "descends to private profit, even incidentally, liability (of the municipality) attaches." *Anderson* v. *Portland,* 130 Me. 214; *Libby* v. *Portland,* 105 Me. 370; or negligence in the keeping of stock for profit on a farm used in support of paupers, *Moulton* v. *Scarborough,* 71 Me. 267.

There may be, of course, an express statute authorizing action where otherwise there would be no liability, as in the case of defective highways. R. S., (1944), Chap. 84, Sec. 88; or drains and sewers, R. S., (1944), Chap. 84, Sec. 148.

The courts have always recognized that a town may act within the scope of its authority as a town in two capacities. One is its governmental and the other its private capacity, although the line of demarcation is often indistinct and difficult to ascertain. Speaking generally, the public or governmental capacity of the municipal governmental agency is the discharge of acts or duties for the benefit of the general public. The private capacity is acting in its own matters, such as the acts as owner of property held for profit or advantage. In almost all affairs of local concern some indirect

relation may be traced to a matter of health, safety, or other subject of governmental cognizance. The test is not the casual or incidental connection, it is whether there is a duty or an authorization under the statute. *Libby* v. *Portland,* 105 Me. 370; *Anderson* v. *Portland,* 130 Me. 214. See also *Opinions of the Justices,* 58 Me. 591; *Bulger* v. *Eden,* 82 Me. 352.

It is well known to all citizens of this state that for more than a generation some towns and some municipal corporations have provided and maintained places as dumping grounds for the disposal of rubbish. In fact, some municipalities have had methods and arrangements for collection by the town. The statutes have not imposed a duty to provide a dump, nor directly authorized a dump, but it has been considered; in certain towns and cities, that under modern conditions and in many instances it is a service which should be rendered to the inhabitants by the municipality. Some towns have therefore assumed the right, through long custom and usage, to raise money for the maintenance of a dump. R. S., (1944), Chap. 80, Sec. 90. See *Spaulding* v. *Lowell,* 33 Pickering (Mass.) 71. A town may pass ordinances for health purposes. R. S., (1944), Chap. 80, Sec. 83. No rubbish shall be placed on any way. R. S., (1944), Chap. 19, Sec. 86. No bottles or cans shall be deposited within the limits of a highway. R. S., (1944), Chap. 128, Sec. 5. No filth to be allowed to collect in any place to the prejudice of others. R. S., (1944), Chap. 128. Sec. 7.

The plaintiff, in his brief and argument, states that the defendant town of Madison was fully authorized by the statute to maintain and operate a dump. He says it was "an act which the municipality has a right to perform" because the town has maintained the dump for forty years; because many other municipalities in Maine under this statute have maintained similar dumps as a "necessary charge." The plaintiff's claim is, that, although authorized

by the statute, this dump became and was a nuisance through negligence. The plaintiff also states that "if the defendant was engaged in a governmental function in the creation and maintenance of fires upon its land, the rule is well established that it is not responsive in damages for negligence."

The line between nuisance and negligence is not well defined and may be coexisting and inseparable. "A thing may be lawful in itself, and yet become a nuisance through negligence in the maintenance or use of it." *Foley* v. *Farnham Co.*, 135 Me. 29. There is no evidence in this case at bar that this Madison dump was a nuisance at any time. No one ever complained until this action was brought.

In the case of *Tuell* v. *Marion*, 110 Me. 460, an applicable rule is stated to be "that municipal corporations are not liable to private action for their neglect to perform, or their negligent performance of corporate duties imposed by statute; but if the acts complained of are not authorized by statute and are done by authority of the municipal corporation, or are afterwards ratified by the corporation, they are liable, as an individual would be, for the same wrongful acts." The law exempts municipal corporations from neglect, or their negligent performance of their public or corporate duties imposed or authorized by statute.

The facts in the case of *Tuell* v. *Marion*, 110 Me. 460, were that the town of Marion in the exercise of a governmental function, constructed a bridge over a navigable stream in such a manner as to obstruct navigation, without a special act of the legislature. It did not appear by the pleadings that the town was authorized by the legislature to erect and maintain such an obstructing bridge. The court held, on demurrer, that if the allegations were proved and there was an obstruction to navigation, to the injury of the plaintiff, not authorized by the legislature, an action could be maintained. The court, in this opinion, indicates that had the legislature authorized this bridge, and the construction of

the bridge was authorized in the manner as actually constructed, there would have been no liability. The court, in the *Tuell* case and in many other decided cases relative to towns, has apparently used the word "imposed" in some instances, when the legislature has "authorized."

In the *Tuell* v. *Marion* opinion the court said in one paragraph that the law exempts when the duties are imposed by statute, although elsewhere the opinion indicates that authorization by a statute is sufficient. Many previous decisions directly state, or plainly indicate that authorization is all that is necessary. If the court, in the *Tuell* case, intended to convey the idea that non-liability depends *only* where a duty is clearly ordered by statute, we must add that the rule also applies where the action is *authorized* by statute.

We believe that the rule of law adopted in Maine and actually followed by the court in deciding *Tuell* v. *Marion*, 110 Me. 461, is the same rule we have endeavored to restate in this case. The old maxim says that "peril lurks in definitions," and in order that there may be no misapprehension in the future as to the effect of the decision in *Tuell* v. *Marion*, we now say that if the rule stated in the *Tuell* case contravenes the principle of law as expressed herein, the case of *Tuell* v. *Marion* is to that extent overruled.

Whether the town of Madison had implied power and authority under the statute to furnish and maintain the dump, or whether the furnishing and maintenance of a dump by the town was contrary to the statute, unauthorized, wholly beyond its corporate powers and therefore *ultra vires*, are questions we need not determine and upon which we need not and do not express an opinion, for there is no liability in either event. We have already decided that the dump was not a nuisance as alleged in the plaintiff's declaration.

The furnishing and maintenance of this dump, if under an express or implied authority, would be the exercise of a

governmental function by the town. There was no profit and no liability. On the other hand, if there was no authority upon the part of the town of Madison to furnish or maintain this dump, and the furnishing and maintenance was contrary to the statute and *ultra vires,* as claimed by the defendant, the controlling rule is laid down in *Seele* v. *Deering,* 79 Me. 343, 346, 347, where the court said:

> "The authority and liability of our *quasi* public corporations known as towns as distinguished from municipal corporations incorporated under special charters, are generally only such as are defined and prescribed by general statutory provisions. Some things they may lawfully do and others they have no authority for doing. To create a liability on the part of a town not connected with its private advantage, the act complained of must be within the scope of its corporate powers as defined by the statute. If the particular act relied on as the cause of action be wholly outside of the general powers conferred on towns, they can in no event be liable therefor whether the performance of the act was expressly directed by a majority vote or was subsequently ratified."

> "It is quite evident that a town independent of any statutory authority, has no corporate power to dig ditches across anothers land. Such an act is ultra vires * * * * and would create no liability on the part of the town."

There is no liability in this case as against the defendant town under either view. If there is implied statute authorization, it is a governmental function and no profit was realized by the town. If it was an *ultra vires* act, the rule in *Seele* v. *Deering,* 79 Me. 343, is controlling. *Bulger* v. *Eden,* 82 Me. 352; *Libby* v. *Portland,* 105 Me. 370, 378.

For the law relative to municipal dumps as stated in other jurisdictions, see 38 American Jurisprudence 269, "Municipal Corporations," Sections 575, 576, 581, 583; McQuillin on Municipal Corporations, Vol. 3, Section 954, Vol. 6, Sections 2807-2840; *Moulton* v. *Fargo,* 39 N. D. 502; 167 N. W.

717; L. R. A. 1918 D 1108; *Haley* v. *City of Boston,* 191 Mass. 291; 5 L. R. A. (N. S.) 1005; 77 N. E. 888; *Gosselin* v. *Town of Northbridge,* 296 Mass. 351; *Saperstein* v. *Everett,* 265 Mass. 195; *Baumgardner* v. *Boston,* 304 Mass. 100; *Hayes* v. *Cedar Grove (W. Va.),* 30 S. E. (2nd) 726; 156 A. L. R. 702, and extensive note.

We find no liability on the part of the town of Madison under the record of this case.

*Judgment for defendant.*